NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

FATUMA H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, P.L., *Appellees*.

No. 1 CA-JV 18-0264
FILED 2-5-2019

Appeal from the Superior Court in Maricopa County
No. JD508362
The Honorable Arthur T. Anderson, Judge

**AFFIRMED**

COUNSEL

David W. Bell, Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Michael J. Brown and Judge Jennifer M. Perkins joined.

---

**J O H N S E N**, Judge:

**¶1**         Fatuma H. ("Mother") appeals the superior court's order terminating her parental rights to her son, P.L.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**         At a prenatal visit in June 2016, Mother tested positive for opiates, amphetamines and marijuana, and she later admitted she was addicted to opiates.  Mother then went on methadone for the remainder of her pregnancy.  In October 2016, about a month after P.L. was born, Mother and the child's father were arrested and jailed following an armed robbery.[1] The Department of Child Safety ("DCS") took custody of P.L. and filed a dependency petition.  The court eventually found P.L. dependent and set a case plan of family reunification.

**¶3**         DCS did not refer Mother for services because she was incarcerated, but the case manager encouraged her to participate in any services available to her during her incarceration.  Mother asked DCS to arrange in-person visits with P.L., but the jail did not allow visits by children.  Mother later pled guilty to one count of hindering prosecution, and in May 2017 was sentenced to 3.5 years' imprisonment.  She then was transferred from jail to a prison that allowed children to visit.

**¶4**         At a hearing in the dependency two months later, the superior court directed DCS "to determine whether face-to-face visits for Mother and the child would be appropriate."  DCS consulted with P.L.'s pediatrician, who recommended against P.L. visiting the prison because it could complicate the child's reactive airway disease.  DCS therefore did not arrange any visits but sent Mother some pictures of P.L.  Mother provided

---

[1]     The superior court terminated the father's parental rights; he is not a party to this appeal.

no financial support for P.L. during her incarceration but did participate in several classes, including substance-abuse and parenting classes.

¶5        In December 2017, DCS moved to terminate Mother's parental rights on grounds of neglect and length-of-sentence pursuant to Arizona Revised Statutes ("A.R.S.") section 8-533(B)(2) and -(B)(4) (2019).[2]  At the severance hearing in May 2018, Mother testified that, notwithstanding her official release date in July 2019, she will be eligible for early release in April 2019.  P.L.'s pediatrician also testified and, at the court's request, wrote a follow-up letter regarding the child's medical status during the year preceding the severance hearing.

¶6        The court terminated Mother's parental rights on the grounds alleged, and Mother timely appealed the order.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 8-235(A) (2019), 12-120.21(A)(1) (2019) and -2101(A)(1) (2019).

## DISCUSSION

¶7        A parent's rights may be terminated if the "parent is deprived of civil liberties due to the conviction of a felony if . . . the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years." A.R.S. § 8-533(B)(4).  In ruling on a motion or petition to sever on this ground, the superior court must consider "all relevant factors," including:

> (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

*Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251-52, ¶ 29 (2000).

¶8        We view the evidence in the light most favorable to sustaining the superior court's findings.  *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).  The superior court is in the best position to weigh

---

[2]        Absent material change since the relevant date, we cite the current version of a statute or rule.

the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We accept the superior court's findings of fact unless no reasonable evidence supports them. *Id.* If this court determines that reasonable evidence supports one termination ground, it need not consider the remaining grounds. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 49, ¶ 14 (App. 2004).

**¶9**　　　　Mother's argument on appeal is aimed at a finding the superior court made under *Michael J.* that she has no relationship with her son. Mother does not dispute that finding, but argues DCS is to blame because it did not allow him to visit her during her incarceration.

**¶10**　　　　The court found P.L. "has a serious respiratory condition that needs constant monitoring" and can be triggered by "environmental" factors. The court further found that Mother was unable to have in-person visits with the child "due to his respiratory condition and the possible exposure to disease triggers in a prison environment." According to the court's findings, the child's "condition has remained fragile throughout this dependency, making it unsafe for him to have in-person visits with Mother in jail or prison."

**¶11**　　　　Mother contends DCS had a "statutory duty" to nurture her relationship with the child that arose from the initial case plan of family reunification, and argues that duty included an obligation to arrange visits with the child. She disputes the court's finding that her son's medical condition precluded visits, and argues that the DCS case manager "incorrectly believed" it would not be safe for the child to come to the prison to visit her.

**¶12**　　　　DCS first contends that Mother waived this argument because she failed to raise the visitation issue with the superior court after July 2017. In this context, however, waiver turns not on whether a parent has raised an issue repeatedly but on whether the parent has preserved that issue for appellate review. *See Logan B. v. Dep't of Child Safety*, 244 Ariz. 532, 536, ¶ 9 (App. 2018) ("failure to raise an argument in the juvenile court waives the issue on appeal[,] . . . [b]ut the decision to find waiver is discretionary"); *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178-79, ¶¶ 16-17 (App. 2014) (applying waiver when parent did not raise any concerns over reunification services during the dependency or argue the issue during trial, and "wait[ed] to bring [the issue] to light for the first time on appeal").

¶13         Here, the record is clear that Mother tried to obtain visits with P.L. She requested visits while she was in jail and did so again after she was transported to prison in May 2017. The parties discussed the issue during a court appearance in July 2017, prompting the court to order DCS to determine whether prison visits would be appropriate in view of P.L.'s unique medical needs. Finally, Mother raised the issue repeatedly during the severance hearing.

¶14         As for the legal basis for Mother's contention, DCS asserts it was "not required to make diligent reunification efforts [including providing visitation] before seeking termination of Mother's parental rights on the length-of-sentence ground." We have held it "well established" that, as a general matter in severance proceedings, the State "has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 186, 192, ¶¶ 1, 34 (App. 1999) (In dependency based on mental-health grounds, State must offer reunification services even though statute does not expressly require it.). We need not decide whether DCS was required to facilitate visits here, however, because the record supports the court's finding that Mother's incarceration and P.L.'s medical condition prevented them.

¶15         Mother does not contend DCS should have arranged for her child to visit her in jail; she impliedly acknowledges that the earliest that visits became possible was after her transfer to prison in May 2017. At that time, however, the child's pediatrician recommended against taking the child to the prison to see Mother. In the opinion of the pediatrician, at that time "the most pressing medical issue for [P.L.] [was] his reactive airways disease." P.L.'s immune system was still developing, so he was "prone to acquiring infections" that could cause him respiratory distress. Notably, according to the pediatrician, P.L.'s risk of distress came from exposure to viral infections transferred by sneezing or coughing, or environmental pollutants, such as allergens and cigarette smoke. The pediatrician stated that it was "difficult to project" the consequences of a prison visit, but with any exposure to new people or places, P.L. could potentially "develop acute respiratory distress" or "a less severe but more chronic cough and wheeze." Accordingly, the pediatrician testified that P.L.'s "risk of becoming ill is directly related to the number of different people" he encounters. Indeed, P.L. did not attend daycare because it was too risky for him at the time. Relying on the pediatrician's advice that it would be "unwise to expose him to prison where there would be multiple people with different infectious diseases," DCS did not arrange in-person visits for Mother.

**¶16** On appeal, Mother argues that other evidence shows P.L. was "healthy enough to have participated in visits with Mother for much of the case." She points to the pediatrician's follow-up letter to the court, which stated that in June 2017, P.L. was having only "mild, intermittent symptoms," and that in July 2017, "he had no active wheezing or respiratory symptoms." Moreover, the pediatrician testified that P.L.'s health was generally at a greater risk during the flu season in winter rather than in summer.

**¶17** Even given the child's limited symptoms in the summer, however, the pediatrician still had concerns about P.L.'s health. She explained that children with respiratory issues "can look okay and decompensate rapidly." She noted that P.L.'s symptoms may be "subtle," and he could seem "very calm and quiet" even when he was "actually distressed." In her follow-up letter, the pediatrician stated that the child's "asthma worsened through the end of 2017 and early 2018, requiring emergency room visits and on two occasions oral steroids." According to the pediatrician, P.L. generally remained "sicker than average until [he went] to the pulmonologist" in February 2018. The pulmonologist placed P.L. on preventative medicine, and his symptoms stabilized by about May 2018.

**¶18** Thus, the record supports the conclusion that, although P.L.'s outward symptoms subsided for a few months in 2017, his risk of decompensating from exposure to new people and places remained. At the same time, the court heard evidence that visiting rooms at Mother's prison consisted of "open rooms with tables and vending machines" and a bathroom where families and children of all ages could visit, meaning that P.L. would be exposed to various people and environmental factors if he visited Mother there.

**¶19** Finally, Mother mentions that she was not allowed any telephonic visits with P.L. The case manager, however, testified that Mother's prison did not allow video conferencing, and DCS did not arrange telephone calls between Mother and P.L. because, at less than two years old, he was too young to meaningfully participate in them.

¶20 In sum, reasonable evidence supports the court's finding that P.L.'s fragile "medical condition and Mother's limited visitation options" prevented visits between Mother and P.L.

## CONCLUSION

¶21 For the foregoing reasons, we affirm the superior court's termination order.



AMY M. WOOD • Clerk of the Court
FILED:  AA